Nelson, J.,
delivered the opinion of the Court.
Without detailing the amendments of the warrant, made from time to time, in the Circuit Court, this may *258 be described as a suit for damages, originating before a Justice, 5tli September, 1865, against the plaintiff in error, “for the taking and converting of a horse,” to the damage of the plaintiff, below one hundred dollars. The Justices who tried the cause rendered judgment for $150, from which the plaintiff in error appealed to the Circuit Court of Putnam. Verdict and judgment were rendered against him, at January Term, 1867, for $32.50, and costs, from which, failing to obtain a new trial, he prosecutes this appeal to this Court.
The evidence contained in the record establishes, substantially, the following facts, viz:
Gunter, the plaintiff in error, was a soldier in the late Confederate army, having been hired by one Whitson, who was a conscript, as his substitute, and came home upon furlough in 1863, “to save his small grain.” Upon attempting to return to his command, he was cut off by the Federal forces, and went back to his home. Under the authority of Brigadier’-General Pillow, a Captain Lowe was at this time engaged in raising a company for the Confederate service, and Gunter, being afraid to fall into the hands of the Federal forces, and unwilling to join Lowe’s company, was, in the language of the witnesses, “lying out,” for the purpose of avoiding both, but, being discovered by Lowe, was compelled to join his company, with -which he remained a short time, when the company was disbanded. Lowe’s company took horses, salt, and other property from the citizens. Among others, they took the horse of Patton. Gunter was present at, but did not participate in, the taking. One witness, a brother-in-law to Patton, who was not summoned till *259 a short time before the trial, states that he afterwards saw Gunter, “along with a portion of the company,” riding the horse, in August or September, 1863, and that when witness said the horse was Patton’s, Gunter “tucked down his head and sneaked off into the orchard to get some apples.” Another witness states that he was with the company when the horse was taken, and heard Gun-ter urging Captain Lowe to give up the' horse- to Patton, because he was an old man and lame, and says, Gunter “had nothing to do with the taking of the horse.”
The value of the horse was variously stated at from §110 to §140. It was further shown in evidence that the general reputation of Gunter for honesty and integrity was good; and his daughter, among other things, testified that, while her father was with the company, she “heard him speak of Captain Lowe taking plaintiff’s horse, and about the taking of things from a wagon; and expressed himself as being opposed to it, and that he intended to leave the company on account of the way it was doing, and that he did leave the company and lay out to keep from going any longer with the company.”
On this state of facts, his Honor, the Circuit Judge, instructed the jury, among other things, that if the band or association of men “were banded together for the purpose of taking booty, and were marauders, they were associated for an unlawful purpose. If they were associated together for the purpose of gathering up conscripts, or other Confederate rebel soldiers, for the purpose of returning them to their command, this also was an unlawful purpose; and this was so even though Lowe, the commander of the squad, may have had a commission or au- *260 tliority from some superior officer of the rebellion, authorizing him to do this thing.” According to- the case of Smith v. Brazelton, and various other cases recently determined by us at Knoxville, we hold that, with the exception of the first sentence, this part of his Honor’s charge was erroneous.
After declaring to the jury that whatever men may think of the rebellion, or say, in the social circle, as to the obligations of honor; treason, in legal contemplation, is a. crime of the highest grade; his Honor proceeded to state that “The law demands of those who are, against their will, conscripted and thus drawn into the rebellion, to leave off and escape as soon as, with safety, they can do so, and will' recognize no points of honor as an excuse for doing otherwise.” His Honor further charged the jury that if the defendant voluntarily remained with the company after he discovered that they were associated together for an illegal purpose, “and the horse was taken in pursuance of their illegal purpose, the defendant is lia_ ble, even though, in this particular instance, he actually opposed the taking of the horse; for the law will not allow that a person may voluntarity associate and connect himself with a band of men confederated together "for an illegal purpose, and then excuse himself for • what may be done in pursuance of the object of the association, on the ground that, in the particular instance complained of, he disapproved the act. If you find, from the evidence, the defendant connected himself with these men, and remained with them through constraint, his will being overdone, and disapproved the taking of the horse, you will find in his favor. And, upon this point, you can look *261 to any peculiarity in bis conduct at tbe time, in connection with the condition of the country, his disengaging from their immediate presence, and again meeting with them, and all other features of the testimony bearing upon this question.”
The cases of Lay v. Huddleston,[1] and Nance v. Haney,[2] recently determined at Knoxville, were, in some respects, similar to this; but this is the first case before us, and so far as we are informed, the first case before any revising tribunal, in which it has been virtually asserted as law, that a soldier engaged in military service is under a legal obligation to become a deserter.- Pretermitting, as the Circuit Judge directed the jury, all considerations of “honor,” the principle announced is most startling when considered only as an abstract question of law. Whatever difference may exist, in judicial opinions, as to the nature of the Government of the Confederate States of America, or as to the manner in which belligerent rights were acquired during the late civil war, it is now universally conceded that such rights in fact existed, and we will not here again consider the manner, in which they were acquired. Under the laws of war, as recognized and promulgated by both belligerents in the late civil war, desertion from either army was punishable with death; and the position -that a soldier in either army was under a legal obligation to incur this penalty, is simply monstrous. Even in England, (where the law of treason was, in former times, stretched to the utmost tension; and where so vast a variety of acts were held to amount to that offense, that *262 the framers of our national Constitution felt it necessary to define the crime with precision, and to circumscribe it within narrow limits,) it was held, before the American Revolution, that a temporary allegiance was due to a King de fado, to an usurper, and that any one who compassed or imagined his death was guilty of treason.
Blackstone, who wrote before our Revolution of 1776, and long before our late civil war, and whose opinions could not by any possibility have been influenced by any events in American history, declared that when “an usurper is in possession, the subject is excused and justified in obeying and giving him assistance; otherwise, under an usurpation, no man could be safe, if the lawful prince had a right to hang him for obedience to the powers in being, as the usurper would certainly do, for disobedience. Nay, further, (continues this most able and popular expounder of the law,) as the mass of people are imperfect judges of title, of which, in all cases, possession is prima facie evidence, the law compels no man to yield obedience to that prince whose right is, by want of possession, rendered uncertain and disputable, till Providence shall think fit to interpose in his favor and decide the ambiguous claim; and therefore, till, he is entitled to such allegiance by possession, no treason can be committed against him.” 4 Bl. Com., 78, m. Vattel declares, book 1, p. 97, § 202, that “the State is obliged to defend and preserve all its members, and the prince owes the same assistance to his subjects. If, therefore, the State or the prince refuses or neglects to succor a body of people who are exposed to imminent danger, the latter, being thus abandoned, become perfectly free to provide for their own safety and preser *263 vation in whatever manner they find most convenient, without paying the least regard to those who, by abandoning them, have been the first to fail in their duty.”
"Viewed in the light of the Constitution and laws of the United States, and considering the Government of the Confederate States as a failure, there can be no question that while said Government continued it was a usurpation. But the duties and obligations of citizens residing within its limits were not, and could not from the necessity of the ease 'be, the same in a state of war that they were in time of peace. New, but temporary, duties and obligations arose which, it is impossible for sophistry to ignore. The authority of the rightful Government was displaced by the red hand of war. The allegiance of the citizen was suspended so long- as the corresponding duty of protection could not be perfonned on the part of the Government. But when the Government resumed, and was able to maintain its authority, and to protect the citizen against the power of the usurper, the obligation of allegiance revived. Mean-while, so long as the usurpation was enabled to maintain its authority, and to compel or permit tlie citizen to join its armies, and to keep those armies in the field, a soldier in that service could not take, nor was be required by any law, human or divine, to take upon himself the responsibility of determining, while the war and his relation as a soldier continued, when it would be safe for him, by desertion, to brave the military power that controlled him. If caught in the act of desertion, no fantastic or quixotic notions of sublimated patriotism would save him from the penalty of an ignominious death, and it is unreasonable to *264 require that be should incur such hazard. The charge of his Honor was, in this and other particulars, radically erroneous; but the errors are too obvious to require further discussion.
' The record shows that, after each party had exhausted his challenges in the selection of the jury, two jiersons, who were admitted to be in every other respect qualified, were peremptorily challenged by the defendant in error, because they had no • certificates as voters, under the recent franchise laws, and were excluded from, serving on. the jury. We hold that his Honor also erred in this, as those laws were, in several of their provisions, ex post facto, and unconstitutional; but' as they have been repealed, and there are other grounds of reversal in this case, we abstain from entering upon the wide field of discussion which would open before us ip assigning reasons for our opinion.
Reverse the judgment, aiid remand the cause.

 1 Heis., 167.

 1 Heis., 177.